24CA0098 Peo v Montgomery 07-16-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0098
Montezuma County District Court No. 22CR5017
Honorable Todd Jay Plewe, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Krystopher Quinn Montgomery,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE MOULTRIE
Gomez, J., concurs
Berger*, J., concurs in part and dissents in part

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 16, 2026

Philip J. Weiser, Attorney General, Erin K. Grundy, First Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John P. Finnegan, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Defendant, Krystopher Quinn Montgomery, appeals the judgment of conviction entered after a jury found him guilty of possession of a weapon by a previous offender (POWPO).  We affirm.

## I.    Background

¶ 2    While Montgomery, his fiancee, and his friend were hauling wood, three boys were playing "a cop game" nearby with their friends.  One of the boys took out a toy gun and pointed it at Montgomery.  According to the prosecution, Montgomery then took out his fiancee's nine-millimeter gun from the floorboard of a truck and pointed it in the children's direction.  Montgomery said, "I got a real strap" or "I have a strap of my own" while pointing the gun.  At some point, Montgomery also showed one of the boys' friends "how to hold the gun" and "took the magazine out."

¶ 3    Montgomery had a different account of what happened. Montgomery contended that before one of the boys pointed a toy gun at him, the boys' friend found his fiancee's BB gun — not a nine millimeter — in the truck.  The BB gun was tan and looked like a handgun.  Montgomery took the BB gun from the friend and told her that she shouldn't take things from other people's vehicles and not to put her finger on the trigger.  Montgomery then showed

1

the friend how to properly hold the BB gun, telling her not to aim it at anyone even though it was fake. Both Montgomery's fiancee and his friend denied seeing Montgomery point the BB gun at any point or hearing Montgomery make any threats.

¶ 4 About a week later, the father of two of the boys confronted Montgomery online, stating: "My kids say you pulled a gun on them." Montgomery replied, "Excuse me? [Your] kids are stupid. And so are you for believing that if you do . . . ." He later added, "They asked me if I have one and I said yes but everything was friendly and I was teaching [the friend] how to properly hold one. Barrel never got pointed at anyone. But I like to fight so I will let you believe [your] kids." After telling Montgomery to stay away from his kids, the father then reported Montgomery to the police. Montgomery was charged with one count of POWPO, two counts of felony menacing, and three counts of misdemeanor child abuse.

¶ 5 A sergeant with the Montezuma County Sheriff's Office testified at trial that Montgomery admitted that he had his fiancee's nine millimeter during the incident. However, the police didn't retrieve the nine-millimeter gun during their investigation. Thus, the nine millimeter was not admitted as evidence, though

Montgomery's counsel did admit photos of the BB gun for the jury's consideration.

¶ 6 The prosecution dismissed one child abuse count before the jury was impaneled, and the court granted Montgomery's motion for judgment of acquittal on the remaining two child abuse counts. The jury acquitted Montgomery of both menacing counts but convicted him of the POWPO count. Although the court initially sentenced Montgomery to one year in the custody of the Department of Corrections, the court resentenced him to one year of community corrections.

¶ 7 Montgomery now appeals, arguing that the court erred by (1) instructing the jury using the 2022 model jury instruction on beyond a reasonable doubt; (2) declining to respond to a jury question about whether a BB gun is a legal firearm; and (3) admitting testimony from one of the boys (child's testimony) about the make of the gun at issue.

## II. Jury Instruction on Reasonable Doubt

¶ 8 Because Montgomery's challenge to the 2022 model criminal jury instruction on reasonable doubt would, if sustained, require

reversal of his conviction, we address it first. We conclude that the trial court didn't err by using that instruction.

## A. Additional Facts

¶ 9 Before trial, the prosecution and defense each submitted proposed jury instructions. The prosecution's proposed instruction on the reasonable doubt standard used the language in the 2022 model instruction. The instruction said in relevant part,

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. If you are firmly convinced of the defendant's guilt, then the prosecution has proven the crime charged beyond a reasonable doubt. But if you think there is a real possibility that the defendant is not guilty, then the prosecution has failed to prove the crime charged beyond a reasonable doubt.

COLJI-Crim. E:03 (2022).

¶ 10 Defense counsel's proposed instruction on the reasonable doubt standard used the language from the 2021 model instruction and said:

> Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as

4

> would cause reasonable people to hesitate to
> act in matters of importance to themselves.

COLJI-Crim. E:03 (2021).

¶ 11    The court held a jury instructions conference, during which defense counsel objected to the prosecution's proposed reasonable doubt instruction, arguing that it lowered the prosecution's burden. The court noted defense counsel's objection but decided to instruct the jury using the prosecution's proposed instruction.

¶ 12    On appeal, Montgomery contends that (1) the inclusion of the "real possibility" language in the reasonable doubt instruction shifted the burden of proof to him and undermined the presumption of innocence and (2) the instruction's omission of language explicitly telling the jury it should consider the lack of evidence in the case lowered the prosecution's burden of proof.

### B.    Legal Principles and Standard of Review

¶ 13    The trial court must properly instruct the jury on the reasonable doubt standard. *Tibbels v. People*, 2022 CO 1, ¶ 25. Whether the court's instruction lowered the prosecution's burden of proof is a question of law that we review de novo. *Id.* at ¶ 22. "An instruction that lowers the prosecution's burden of proof below

5

reasonable doubt constitutes structural error and requires automatic reversal." *Johnson v. People*, 2019 CO 17, ¶ 8.

## C.    Application

¶ 14    While Montgomery's appeal was pending, three divisions of this court published opinions considering similar challenges to the 2022 model reasonable doubt instruction. *See People v. Melara*, 2025 COA 48, ¶¶ 22-23; *People v. Schlehuber*, 2025 COA 50, ¶¶ 16-17; *People v. Berumen*, 2025 COA 93, ¶ 14. In all three cases, the majorities concluded that the 2022 instruction doesn't lower the prosecution's burden of proof. *Melara*, ¶¶ 24, 30; *Schlehuber*, ¶¶ 2, 19, 28-29; *Berumen*, ¶¶ 29-30, 33.[1] We agree with the reasoning of those majority opinions and adopt it to resolve Montgomery's arguments.

---

[1] The Colorado Supreme Court has granted a petition for certiorari in *Teran-Sanchez v. People*, No. 25SC148, 2025 WL 2506067 (Colo. Sep. 2, 2025) (unpublished order), to address "[w]hether the trial court's jury instruction on burden of proof and reasonable doubt, based on the 2023 Model Criminal Jury Instruction . . . violated [the defendant's] federal and constitutional rights to due process and a fair trial." The 2023 version of the model instruction includes the "lack of evidence" language but is otherwise identical to the 2022 model instruction. *See* COLJI-Crim. E:03 cmt. 8 (2023) ("In 2023, the Committee added the final sentence to the instruction's first paragraph regarding evidence or lack of evidence.").

¶ 15　　First, we aren't persuaded by Montgomery's argument that the "real possibility" language in the instruction holds a defendant to a higher standard than the law requires and skirts the line of directing a jury to determine whether a defendant is innocent, rather than simply requiring it to determine whether the prosecution has met its burden to demonstrate that a defendant is guilty.

¶ 16　　The court's instruction said that "reasonable doubt" is a "real possibility that the defendant is not guilty" and that it "requires more than proof that something is highly probable." *See* COLJI-Crim. E:03 (2022). The "real possibility" language explains the prosecution's evidentiary threshold, and it instructs the jury not to acquit the defendant based on *any* conceivable doubt, no matter how improbable. *See Schlehuber*, ¶¶ 31, 34. This is an accurate expression of the prosecution's burden of proof under the reasonable doubt standard. *Id.* at ¶¶ 30-31; *see Victor v. Nebraska,* 511 U.S. 1, 24-27 (1994) (Ginsburg, J., concurring in part and concurring in the judgment) (concluding that similar model instruction language stated the reasonable doubt standard "succinctly and comprehensibly").

¶ 17   Moreover, "equating reasonable doubt with a 'real possibility' [doesn't] shift the burden to the defendant to establish that real possibility" because nothing about that phrase suggests that evidence from the defendant must be "the source of the 'real possibility.'" *Schlehuber,* ¶ 34 (quoting *United States v. Taylor,* 997 F.2d 1551, 1557 (D.C. Cir. 1993)); *accord Berumen,* ¶ 29.  To the contrary, the court's instruction said that if a juror thinks "there is a real possibility that the defendant is not guilty, then *the prosecution* has failed to prove the crime charged beyond a reasonable doubt."  (Emphasis added.)  And the court's instruction also correctly informed the jury that the burden of proof was "upon the prosecution" and that the "prosecution must prove to the satisfaction of the jury beyond a reasonable doubt the existence of each and every element necessary to constitute the crime charged." *See Berumen,* ¶ 28.

¶ 18   We acknowledge Judge Berger's partial dissent in *Berumen* raises legitimate concerns about the use of the "real possibility" language.  *See id.* at ¶¶ 60-79 (Berger, J., concurring in part and dissenting in part).  Judge Berger maintains that position here. Nevertheless, we agree with the *Berumen* majority that the use of

8

that phrase, when considered in context and as a part of the instructions as a whole, doesn't shift the prosecution's burden. *Id.* at ¶¶ 26-30 (majority opinion); *see also United States v. Petty*, 856 F.3d 1306, 1310 (10th Cir. 2017) (concluding that a similar definition of reasonable doubt that instructed the jury that it must acquit the defendant if there existed a "real possibility" that the defendant wasn't guilty was "a correct and comprehensible statement of the reasonable doubt standard" (quoting *United States v. Conway*, 73 F.3d 975, 980 (10th Cir. 1995))).

¶ 19      Second, the instruction's omission of specific language directing the jury that it may consider "the lack of evidence" didn't lower the prosecution's burden of proof because the instruction as a whole informed the jury that "if the prosecution fails to present sufficient evidence of guilt, it will not have met its burden." *Schlehuber*, ¶ 22.

¶ 20      Noting the majority's statement in *Melara*, ¶ 28, that the "lack of evidence" language "provides a defendant with an express legal foundation to encourage the jury to look at the absence of evidence in considering whether reasonable doubt exists," Montgomery

9

argues that the court's failure to include the "lack of evidence" language was reversible error. We aren't persuaded.

¶ 21 While inclusion of that language might have been better, *see id.*, the court's failure to include it here didn't amount to error. We agree with the *Schlehuber* division that "a court does not err by omitting that language" because "the concept of reasonable doubt inherently invites jurors to consider what evidence is missing" and "if the prosecution fails to present sufficient evidence of guilt, it will not have met its burden." *Schlehuber*, ¶¶ 20-22; *accord Berumen*, ¶ 33. And, in any event, so long as a jury instruction correctly articulates the applicable law, no one particular phrasing is preferred over another. *Schlehuber*, ¶ 28; *see Victor*, 511 U.S. at 5 ("[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." (citation omitted)).

¶ 22 Accordingly, we discern no error in the court's decision to instruct the jury on reasonable doubt using the 2022 model instruction.

10

## III. Jury Question

¶ 23 Montgomery argues the court plainly erred by failing to provide additional instructions to the jurors that a BB gun isn't a firearm in response to their question. The People contend that Montgomery waived this argument. We agree with the People.

### A. Additional Facts

¶ 24 The court instructed the jury that to find Montgomery guilty of POWPO, he must have "possessed, used, or carried upon his person a firearm." The court also instructed that "firearm" means "any handgun, automatic, revolver, pistol, rifle, shotgun, or other instrument or device capable or intended to be capable of discharging bullets, cartridges, or other explosive charges." This definition mirrored the statutory definition of "firearm" in section 18-1-901(3)(h), C.R.S. 2025.

¶ 25 Montgomery's theory of defense at trial was that the boys' friend found his fiancee's BB gun and Montgomery showed her how to properly hold it. Consistent with this theory, Montgomery's counsel argued that although he had a BB gun, he never had a "real gun," and therefore he couldn't be convicted of POWPO for possession of a firearm. The prosecution countered that

11

Montgomery did have a real gun — his fiancee's nine millimeter — not a BB gun.

¶ 26 After deliberating for an hour, the jury asked the court: "Is a pellet gun or BB gun a legal firearm?"[2] The court proposed responding to the jury's question by informing the jury that it "w[ould] not receive further instructions in this regard." Montgomery's counsel didn't object to the court's proposed response.

### B. Legal Principles and Standard of Review

¶ 27 "The United States and Colorado Constitutions guarantee the defendant in a criminal case both the right to have a jury decide his case and the right to have the prosecutor prove to that jury, beyond a reasonable doubt, every element of the charged offense." *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001) (first citing U.S. Const. art. III, § 2, cl. 3; then citing U.S. Const. amend. VI; then citing U.S. Const. amend. XIV, § 1; and then citing Colo. Const. art. II, §§ 16, 23, 25).

---

[2] Although the jury asked whether a pellet gun is a legal firearm, there is no reference in the record of Montgomery possessing a "pellet gun." Instead, the defense only argued Montgomery had a "BB gun." Accordingly, our analysis only discusses BB guns.

"[A] trial court is under an obligation to instruct the jury properly, and a failure to do so as to every element of a crime charged is plain error." *Chambers v. People*, 682 P.2d 1173, 1176 (Colo. 1984) (citation omitted).

¶ 28    However, even fundamental rights can be waived. *Phillips v. People*, 2019 CO 72, ¶¶ 16, 21; *Stackhouse v. People*, 2015 CO 48, ¶ 8 ("[E]ven fundamental rights can be waived, regardless of whether the deprivation thereof would otherwise constitute structural error."). A waiver is "the *intentional* relinquishment of a *known* right or privilege." *People v. Rediger*, 2018 CO 32, ¶ 39 (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)). A waiver may be explicit, such as "when a party expressly abandons an existing right or privilege," or implied, such as "when a party engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion." *Forgette v. People*, 2023 CO 4, ¶ 28. Reviewing courts "indulge every reasonable presumption against waiver." *Rediger*, ¶ 39 (quoting *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984)).

¶ 29    To determine whether a defendant has waived a claim, we consider the record as a whole. *See id.* at ¶¶ 42-44. Whether a

13

defendant has waived a claim of error is a question of law that we review de novo. *Id.*

## C. Application

¶ 30 Montgomery says that his claim that the court should have instructed the jury that a BB gun isn't a firearm is subject to plain error review. He thus acknowledges that this claim isn't preserved; however, he disputes the People's assertion that he waived this claim.

¶ 31 Montgomery argues that, at most, he merely forfeited the issue. In support of this argument, he compares the circumstances here to those in *Rediger*, where the supreme court noted that a rote statement that counsel is not objecting to an instruction is insufficient to demonstrate waiver. *Rediger*, ¶ 45 ("[T]here must be some evidence that the waiver is 'knowing and voluntary,' beyond counsel's rote statement that she is not objecting . . . ." (quoting *United States v. Zubia-Torres*, 550 F.3d 1202, 1207 (10th Cir. 2008))). But this case is different than *Rediger*.

¶ 32 *Rediger* involved a defendant's challenge to a jury instruction that he claimed constructively amended the charges in the complaint. *Id.* at ¶ 12. Defense counsel in *Rediger* only indicated

14

generally that he was satisfied with an entire set of jury instructions. *Id.* at ¶¶ 8, 10. There was no indication that anyone had discussed the particular instruction that the defendant challenged on appeal as having constructively amended the charging document. *Id.* at ¶ 43. Indeed, the supreme court observed that "nothing in the record suggests that . . . [the defense], the prosecution, or the trial court even noticed" the error in the instruction. *Id.* at ¶ 35. In that context, the court determined that the defendant hadn't waived the instructional error because there was "no evidence, either express or implied, that [he] intended to relinquish his right to be tried in conformity with the charges set forth in his charging document when he generally acquiesced to the jury instructions." *Id.* at ¶¶ 42, 44.

¶ 33    Here, by contrast, Montgomery was aware of, and the parties specifically addressed, the very issue Montgomery now raises on appeal. As noted above, Montgomery's theory of defense was that he *only* possessed a BB gun — which he contends is not a firearm as contemplated by the POWPO statute. Unlike the situation in *Rediger*, Montgomery's defense counsel wasn't simply presented with a packet of instructions to which she lodged no objection.

Instead, the court reviewed the jury's question with the parties and indicated its intent to respond that it wouldn't instruct the jury further. Defense counsel didn't ask the court to provide the jury with an additional instruction stating that a BB gun isn't a firearm. Indeed, defense counsel expressly stated that she didn't object to the court's proposed course of action.

¶ 34    In other words, Montgomery's defense counsel was presented with — and rejected — the opportunity to address the instructional error he now asserts requires reversal. We thus conclude that he waived his assertion of error on this issue. *See People v. Hoover*, 165 P.3d 784, 796 (Colo. App. 2006) ("Active participation in the preparation of a response to a jury question, or express agreement with it, bars the participant from arguing that the response constitutes error.").

IV.    Child's Testimony

¶ 35    Montgomery also contends the trial court abused its discretion and violated his constitutional due process rights by allowing one of the boys, who was thirteen years old at the time, to testify that the gun Montgomery had during the incident was "a SIG" or "a nine

16

millimeter or a .45 ACP."[3]  He contends that the testimony amounted to unendorsed and unqualified expert testimony related to a key dispute in the case.  We aren't persuaded.

## A.    Additional Facts

¶ 36    After the prosecutor elicited testimony from the child that he was "pretty familiar with firearms," the prosecutor asked him, "How so?"  Montgomery's counsel objected: "[A]sk[s] for foundation for expert testimony and no expert's been endorsed."  The court overruled the objection, stating, "He can testify . . . to how he's familiar."  The boy testified:

> I like to watch videos on them, I research
> them, I always am just — I've loved a gun
> since the day I was born.  I've been trying to
> buy my own gun.  I love hunting, I go up in the
> mountains with my friends and I hunt with
> him, so I'm very familiar with guns and I know
> how to be safe with them . . . .

---

[3] Presumably, the child was referring to SIG Sauer, a brand of firearms, and Automatic Colt Pistol, a type of firearm cartridge.  *See generally* SIG SAUER, *Firearms*, https://perma.cc/44NU-L8F2; D.L. Hawley, *Firearms Forensics — Firearms Identification at Trial*, 60 Am. Jur. Proof of Facts 3d 1, § 2, Westlaw (database updated June 2026).

¶ 37     The prosecutor then asked if the boy could "tell the difference between a BB gun and an actual firearm." When the boy answered, "Yes," the prosecutor continued: "If you had to narrow it down, could you say what kind of gun this was, maybe?" The boy responded: "It could have been a SIG, it could have been something different, I'm not a hundred percent sure, but I'm pretty sure it was a SIG, could have been chambered a nine millimeter or a .45 ACP." The boy later testified that he never handled or inspected the gun.

### B.     Legal Principles and Standard of Review

¶ 38     A trial court's determination of whether a witness's testimony is lay (under CRE 701) or expert (under CRE 702) is a fact-specific inquiry and depends on the circumstances of the case. *Venalonzo v. People*, 2017 CO 9, ¶¶ 17-18, 24. To make this determination, a trial court must look to the basis for the witness's opinion. *Id.* at ¶ 2. "If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony." *Id.* But if the witness provides testimony that couldn't be offered "without specialized experiences, knowledge, or training, then the witness is offering expert testimony." *Id.*

¶ 39    "We review a [trial] court's decision allowing testimony for an abuse of discretion." *People v. Robles-Sierra*, 2018 COA 28, ¶ 23. A trial court abuses its discretion if it allows a witness to offer expert testimony in the guise of lay opinion testimony. *Venalonzo*, ¶¶ 29-31. If we conclude that the trial court abused its discretion in allowing testimony to which a defendant failed to contemporaneously object, we determine whether the court's error constitutes plain error. *Robles-Sierra*, ¶ 23. "An error is plain only if it was obvious and so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction." *Id.*; *see also Hagos v. People*, 2012 CO 63, ¶ 18 (to constitute plain error, an error must be both obvious and substantial); *Campbell v. People*, 2020 CO 49, ¶ 25 ("obvious" error is that which contravenes "clear statutory prescription, a well-settled legal principle, or established Colorado case law"); *Hagos*, ¶ 14 ("substantial" error is that which "so undermine[s] the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction" (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005))).

19

## C. Application

¶ 40 As an initial matter, we disagree with Montgomery that he preserved this argument for appeal. When the prosecutor asked the child on direct examination how he was familiar with firearms, defense counsel objected, arguing that the question called for expert testimony. The court properly overruled the objection, explaining that the child could "testify to how he's familiar," because at that point the child was only addressing his own firearms experience and wasn't offering an opinion about anything. *See Venalonzo*, ¶ 27 ("[An] interviewer's testimony describing her professional background, including the number of interviews she has conducted and the number of times she has testified in court, is not expert testimony because any ordinary person is capable of describing her own credentials.").

¶ 41 When the child went on to testify that he could tell the difference between a BB gun and "an actual firearm" and that he was "pretty sure" the gun Montgomery pointed at him was "a SIG" or "a nine millimeter or a .45 ACP," defense counsel didn't lodge any additional objections. Thus, Montgomery didn't object to the testimony he now challenges on appeal. *See People v. Van Meter*,

20

2018 COA 13, ¶ 59 (unless the court has made a definitive ruling at or before trial on the admissibility of particular evidence, a party must lodge a contemporaneous objection to preserve an objection to that evidence).  Accordingly, we consider Montgomery's challenge under the plain error standard.  *See id.* at ¶ 60.

¶ 42     We don't discern any plain error in the court's admission of the challenged testimony.  First, assuming without deciding that the court abused its discretion in allowing the testimony, we conclude that any error wasn't obvious.  There is no published case law in Colorado addressing whether the particular testimony at issue in this case — a witness's opinion, based on their observation of a firearm, that it is real and is a particular type or brand of firearm — constitutes an expert opinion.

¶ 43     In support of his assertion that the child's testimony was expert rather than lay, Montgomery cites *People v. Howard-Walker*, in which a division of this court determined that a police detective offered expert testimony when he opined that a handgun shown in a surveillance video was real because of the size of the barrel.  2017 COA 81M, ¶¶ 55-57 (holding that the admission of the testimony by

21

a lay witness was error but that it didn't amount to plain error), *rev'd on other grounds*, 2019 CO 69, ¶¶ 29, 48.

¶ 44     But the testimony at issue in *Howard-Walker* was quite different than the testimony at issue in this case.  There, the witness was a police detective who "presumably had familiarity with guns" based on his specialized job experience, *id.* at ¶ 51; here, the witness was a young teenager who said he loved guns and going hunting with friends.  There, the witness viewed the gun on a surveillance video, while here, the witness observed the gun in person and said the gun had been pointed at him.  *See id.* at ¶¶ 47, 55.  And there, the witness based his conclusion on details about the gun's barrel, explaining that it was an "open barrel" and "a large barrel for a large projectile to exit the weapon" whereas "[a]ir soft guns [sic] their muzzles have a red tip and small barrel for the little air soft pellet to come out" — leading the division to "strongly doubt that a witness lacking specialized knowledge can determine whether a gun depicted in a video was real or fake based on its barrel size." *Id.* at ¶¶ 47, 55.  Here, though, the witness simply said, based on his perception of the gun's appearance, that he was "pretty sure" it was "a SIG" or "a nine millimeter or a .45 ACP."

¶ 45    Other cases from Colorado and elsewhere suggest that lay witnesses who have recreational gun experience may well be able to identify what type or brand a firearm might be, without delving into specialized training or knowledge. *See People v. Williams*, 2025 COA 26, ¶ 35 ("[S]omeone with recreational gun experience [could] identify the caliber of ammunition that certain guns take without specialized training or knowledge."); *United States v. Holloway*, 621 F. App'x 155, 157 (4th Cir. 2015) (a trial court didn't err by admitting a lay witness's testimony that he believed a gun was real because that "did not require specialized or technical knowledge or training"); *United States v. Martinez-Armestica*, 846 F.3d 436, 441 (1st Cir. 2017) ("[A] witness need not be familiar with firearms . . . to testify that [a firearm] was real.").

¶ 46    In the absence of case law more directly on point signifying that the court abused its discretion by allowing the child's testimony, we can't conclude that any error in the admission of the testimony was so clear cut that the court "should have been able to avoid it without the benefit of an objection." *People v. Rojas*, 2025 COA 25, ¶ 44; *see Campbell*, ¶ 25; *Venalonzo*, ¶ 24 (The distinction between lay and expert testimony "can be a difficult one.").

23

¶ 47    Second, we conclude that the alleged error, if an error at all, wasn't substantial.  Even if the child's testimony about the particular type of firearm he believed Montgomery had veered into expert opinion territory, the child's overall assessment that it was "an actual firearm," and not a BB gun, likely did not.  *See Williams*, ¶ 35; *Holloway*, 621 F. App'x at 157; *Martinez-Armestica*, 846 F.3d at 441.  And the relevant question here wasn't what type of firearm Montgomery had but, rather, whether he had a firearm at all.  Thus, even if the trial court erred by allowing the child to report his belief about the specific type of firearm, any error was harmless.  *See Hagos*, ¶ 14.

¶ 48    Moreover, there was substantial other evidence that, if believed by the jury, demonstrated that the gun Montgomery had wasn't a BB gun.  One of the other boys testified that while pointing the gun, Montgomery said something like, "I got the real strap," which the child took to mean that Montgomery had "a real gun."  The boy further testified that Montgomery took out the magazine that held the bullets, suggesting it was a real gun.

¶ 49    An investigator testified that when questioned after the incident, Montgomery said he'd been holding his fiancee's "nine

millimeter" and never "ma[d]e any claims that it was a BB gun or anything other than an actual firearm."  And when the father of two of the boys confronted Montgomery a week after the incident, accusing him of having "pulled a gun on [the boys]," Montgomery didn't deny having a gun or suggest that he merely had a BB gun. Instead, he responded that "[t]hey asked me if I have one and I said yes," insisted that he was "teaching [one of the children] how to properly hold one," and stated that the "[b]arrel never got pointed at anyone."  Given all the evidence that Montgomery possessed a firearm, we can't conclude that any error in admitting the child's testimony "so undermined the fundamental fairness of the trial . . . as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* (quoting *Miller*, 113 P.3d at 750).

## V.    Disposition

¶ 50    The judgment is affirmed.

JUDGE GOMEZ concurs.

JUDGE BERGER concurs in part and dissents in part.

25

JUDGE BERGER, concurring in part and dissenting in part.

¶ 51 I agree with the majority's analysis and conclusion that Montgomery waived his challenge regarding the trial court's response to the jury question about whether a BB gun is a firearm. I also agree with the majority's analysis and conclusion that any error in admitting the child's testimony regarding the gun was harmless and does not warrant reversal.

¶ 52 However, I adhere to my views set forth in *People v. Berumen*, 2025 COA 93, ¶¶ 60-79 (Berger, J., concurring in part and dissenting in part), and conclude that the jury in this case was improperly instructed on the definition of reasonable doubt. Therefore, I believe Montgomery is entitled to a new trial before a jury properly instructed on the meaning of reasonable doubt.

¶ 53 Accordingly, I respectfully dissent from the portion of the majority's opinion concluding that the jury instruction defining reasonable doubt did not constitute structural error.